# EXHIBIT C

Case 1:04-cv-00203-GMS   Document 14-4   Filed 03/02/2006   Page 1 of 11

LEXSEE 2003 DEL. CH. LEXIS 6

JOHN M. BROWN and FRANCES V. BROWN, Plaintiffs, v. HOUSTON VENTURES, L.L.C. JOHN M. HUGHLETT, JR. and KAY E. HUGHLETT, Defendants.

C.A. No. 2046-S

COURT OF CHANCERY OF DELAWARE, SUSSEX

2003 Del. Ch. LEXIS 6

January 7, 2002, Submitted
January 3, 2003, Decided

**DISPOSITION:** Plaintiffs found entitled to an easement by prescription.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff property owners sued defendant neighbors, seeking a determination that they had an easement by implication or by prescription over a portion of the neighbors' property in order to gain access to a garage on their property.

**OVERVIEW:** The owners owned Lot 8; the neighbors, Lot 9. The owners' predecessors regularly used a driveway over both lots to access a house and, following its construction, a garage. Without access over a portion of Lot 9, the owners' garage could not be used for its intended purpose. The neighbors' immediate predecessor in title erected a fence through the driveway and blocked the owners' access to the garage and to their kitchen door. When the neighbors acquired Lot 9, they were aware of the owners' claim to an easement. The court found no easement by implication, as the owners did not prove that at the time of the subdivision of the lots there had been a driveway. Nor was there an easement by necessity, as when the garage was erected, there was no longer common ownership of Lots 8 and 9. However, the owners were entitled to a prescriptive easement, as they established by clear and convincing evidence open, notorious, adverse, and continuous use of the driveway for an uninterrupted 20-year period. That former owners of Lots 8 and 9 had been, respectively, uncle and nephew, did not compel the conclusion that the use was not adverse, in the face of evidence to the contrary.

**OUTCOME:** The owners were entitled to an easement by prescription over the easterly portion of the neighbors' lot. The court issued an injunction requiring the neighbors to remove the fence and prohibiting them from interfering with the owners' use of the driveway.

**CORE TERMS:** driveway, easement, garage, tenant, prescription, hostile, clear and convincing evidence, parcel, continuous, door, familial relationship, right to use, kitchen, notorious, ownership, fence, pond, prescriptive, permissive, entrance, built, filling station, boundary line, reservation, conveyance, approached, servitude, severance, conveyed, erected

**LexisNexis(R) Headnotes**

*Real & Personal Property Law > Estates, Rights & Titles > Easements & Rights of Way*
[HN1] An easement may be created in any of several ways: by express grant or reservation, by implication, by necessity, or by prescription.

*Real & Personal Property Law > Estates, Rights & Titles > Easements & Rights of Way*
[HN2] An easement by implication arises under a limited set of circumstances. If a single party owns two parcels of property and uses one to benefit the other, no actual easement is created since only one owner is involved. Because this use resembles an easement, however, it is referred to as a "quasi-easement." If the property owner then conveys the "quasi-servient tenement," he may retain an actual easement appurtenant to the land he keeps, even if the conveyance is wholly silent on the question of easements and even if the easement is not absolutely necessary for the enjoyment of the retained property. Thus, if a property owner has traditionally crossed parcel A to reach parcel B and he sells parcel A, he may continue to cross that parcel. It is presumed that a grantor in

this situation does not wish to abandon the preexisting land use; the grantee is put on notice by observing evidence of the preexisting use. The key to an implied easement is the existence of a quasi-easement.

*Real & Personal Property Law > Estates, Rights & Titles > Easements & Rights of Way*
[HN3] A party seeking an easement by implication must demonstrate: (1) unity of title during which time a servitude is imposed on one part of an estate in favor of another part, the servitude being in use at the time of severance of title; (2) the nature of the servitude must appear to be permanent and obvious prior to the severance; and (3) the servitude was necessary for the reasonable enjoyment of the other part of the property at the time of severance.

*Real & Personal Property Law > Estates, Rights & Titles > Easements & Rights of Way*
*Evidence > Procedural Considerations > Burdens of Proof*
[HN4] In order to establish an easement by prescription, plaintiffs must demonstrate, by clear and convincing evidence, that they or persons in privity with them have used the disputed area (1) openly and notoriously; (2) exclusively; (3) continuously; and (4) adverse to the rights of others for an uninterrupted 20-year period. Easements by prescription are generally disfavored because they necessarily work forfeitures of existing property rights.

*Real & Personal Property Law > Estates, Rights & Titles > Easements & Rights of Way*
[HN5] "Continuous use," in the context of establishing an easement by prescription, does not mean constant use but simply the exercise of the claimed right more or less frequently according to the nature of the use.

*Real & Personal Property Law > Estates, Rights & Titles > Easements & Rights of Way*
[HN6] For purposes of an easement by prescription, the use must be exclusive as against the public at large, but the true owner and the person acquiring the easement by prescription may both make use of the easement.

*Real & Personal Property Law > Estates, Rights & Titles > Easements & Rights of Way*
[HN7] In the context of establishing an easement by prescription, the terms "adverse use" and "hostile use" are used interchangeably. A use is adverse or hostile if it is inconsistent with the rights of the owner. The use must not be subordinate or subservient to the owner's rights.

*Real & Personal Property Law > Estates, Rights & Titles > Easements & Rights of Way*
[HN8] In the context of establishing a prescriptive easement, where the evidence demonstrates that all of the rights of tenants derived from the landlord's rights, tacking during the period of tenant possession and use is allowed.

*Real & Personal Property Law > Estates, Rights & Titles > Easements & Rights of Way*
[HN9] Determination of whether there is "hostility" for purposes of an adverse or prescriptive claim is a fact-intensive inquiry. The effort must focus upon objective facts because of difficulties inherent in any inquiry into a person's subjective intent, especially in light of the many years over which the inquiry may be required. That a person may be more likely to allow permissive use of her property by a family member than by a stranger is, in general, an accurate assessment of how persons interact with others. On the other hand, it is not so compelling, particularly in which the relationship is that between an uncle and a nephew, to create a firm presumption or to establish an even higher evidentiary burden. Nevertheless, the familial relationship may be an important factor when evaluated in the context of all the other relevant factors guiding the court in its resolution of the prescriptive claim. Of course, the closer the familial relationship, the more compelling that relationship usually will be. While inquiry into the nature of the personal relationship may require consideration of factors that one would prefer to avoid, it may, at least in some cases, be unavoidable.

COUNSEL: [*1] Barbara-Cherrix O'Leary, Esquire, Rehoboth Beach, Delaware, for Plaintiffs.

Larry W. Fifer, Esquire, Lewes, Delaware, for Defendants, John M. Hughlett, Jr. and Kay E. Hughlett.

JUDGES: John W. Noble, Vice Chancellor.

OPINIONBY: John W. Noble

OPINION:

### MEMORANDUM OPINION

NOBLE, Vice Chancellor

This is the story of the Crowded Hut. More specifically, this is the Court's post-trial decision determining

the rights of the owners of the Crowded Hut to use their neighbors' lands for access to the Crowded Hut.

Plaintiffs, John M. Brown and Frances V. Brown ("the Browns"), own the Crowded Hut on Lot 8 in Red Mill Manor on the north shore of Red Mill Pond, which is northwest of Lewes, Delaware. Defendants, John M. Hughlett, Jr., and Kay E. Hughlett ("the Hughletts"), own the adjacent Lot 9 of Red Mill Manor. The Browns claim an easement, either an easement by implication or an easement by prescription, over a portion of the Hughletts' property in order to gain access to their garage and what once was the principal entrance to the Crowded Hut. n1

> n1 Defendant Houston Ventures LLC ("Houston Ventures") built the house on Lot 9 in which the Hughletts reside and sold that property to them. By stipulation, Houston Ventures has been dismissed as a defendant in this action.

[*2]

### I. Findings of Fact

The Truitt family had owned lands on the north side of Red Mill Pond since the 1930s. Several small fishing shacks had been established for family members and renters. In the mid-1960s, as the result of the widening of what is now Delaware Route 1, Harold Shaffer moved a small filling station onto the Truitt lands. It was framed up and used as a fishing cabin by Mr. Shaffer. Access to Mr. Shaffer's shack and the other fishing shacks was over a dirt road that meandered with the shore of the mill pond. Because the structure that had been a filling station was quite close to the shoreline, the dirt lane was behind it (*i.e.*, on the side away from the pond).

In 1970, the Truitt family patriarch passed away and Mr. Shaffer's lease was not renewed. The filling station that Mr. Shaffer placed on the Truitt lands was then occupied by members of the Truitt family and used primarily as a summer vacation home. Jacqueline Cassady, a member of the Truitt family, and her family started to use the old filling station which, because of its cramped conditions, became known as the "Crowded Hut."

The next generation of Truitts, including Mrs. Cassady, decided to subdivide [*3] the property into a development known as Red Mill Manor. A plot was recorded in 1970. A new access road, Pondview Drive, dedicated by the recorded plot, was thereafter built, but it is not clear precisely when that occurred. Pondview Drive, generally, is approximately 200 feet north of the mill pond's shoreline. Through a series of straw deeds, several lots of the development were conveyed to members of the Truitt family. Lot 8, which contains the Crowded Hut, was conveyed to Mrs. Cassady in 1971.

Lot 9 was conveyed to her sister, Abigail S. Grove, and Lot 10 was acquired by her brother, James L. Truitt, Jr. ("Mr. Truitt") and his wife. Shortly thereafter, Lot 9 was transferred to Mr. Truitt. Before construction of Pondview Drive, and while Mrs. Cassady and her family were using the Crowded Hut primarily as a summer vacation home, their access, which was substantially the same as Mr. Shaffer's access, was a short driveway from the dirt road. Cars were parked to the west of the Crowded Hut because its principal entrance, the kitchen door, was along its west wall. Following the subdivision of the lots and the construction of Pondview Drive, use of the dirt road ceased. A driveway located [*4] on both Lots 8 and 9 (the "Driveway") provided physical access for both lots to Pondview Drive. At first, the Driveway was little more than a set of tracks. With time, it became more well established. In the mid 1970s, Mr. Truitt built a home on Lot 10. n2 Mr. Truitt's access to his house was over the Driveway that evolved on both Lots 8 and 9. Lot 9 remained vacant.

> n2 Actually, the house which was built on Lot 10 encroached by six feet or so onto Lot 9.

In 1974, after Mrs. Cassady's death, her husband conveyed Lot 8 to their son, Robert L. Cassady, Jr. ("Mr. Cassady"), who made the Crowded Hut his permanent residence. Mr. Cassady initially improved the Crowded Hut to make it more livable. He also used the kitchen door as his principal entrance and parked opposite the door. His access to the Crowded Hut from Pondview Drive was over the Driveway. Mr. Cassady and Mr. Truitt, his uncle, had a very good relationship. n3 They cooperated in maintaining and improving the Driveway. Mr. Truitt never objected to, or expressed [*5] any reservations concerning, Mr. Cassady's use of the Driveway.

> n3 Mr. Truitt and Mr. Cassady owned their parcels with their wives. Although the evidence is paltry, I am satisfied (and do not understand the parties to disagree) that the wives' use of and understanding of the status of the Driveway were comparable to those of their husbands.

In 1975, Mr. Cassady added a garage to the Crowded Hut. The garage was placed on the north side (away from the mill pond) of the Crowded Hut with its front in line with the west side (*i.e.*, the kitchen door) of the existing structure. The garage opened in the direction of Lot 9 and, because the Crowded Hut lies very close to the boundary line between Lot 8 and Lot 9, vehicular

access to the garage required use of the Driveway, not only for reaching the garage, but also for affording a sufficient turning radius to enter and exit the garage. Mr. Truitt assisted Mr. Cassady in building the garage. Without access over a portion of Lot 9, the garage could not and cannot be [*6] used for its intended purpose. n4

> n4 This finding is based not only upon the testimony, but also upon the Court's view of the premises following trial.

By the early 1980s, Mr. Cassady was contemplating an expansion of the Crowded Hut. Mr. Truitt, an engineer by training, developed plans for a major expansion. These plans show the Driveway serving the Crowded Hut as placed on both Lots 8 and 9. They also anticipate construction of a new garage with access to Pondview Drive over the Driveway partly on both lots.

During his ownership of the Crowded Hut, Mr. Cassady regularly and consistently used the Driveway leading from Pondview Drive over both lots for convenient access to the kitchen door parking area and, following its construction, access to the garage. This was done with the full knowledge of Mr. Truitt. n5 Mr. Cassady believed that he had the right to use that portion of Lot 9 which contained the Driveway for his access to the Crowded Hut. n6 However, no written easement agreement, joint use agreement or [*7] other document evidencing the appropriate use of the Driveway was ever executed or recorded.

> n5 There is no credible evidence that Mr. Truitt ever expressly gave permission for Mr. Cassady's use of the Driveway.
>
> n6 Mr. Cassady testified that he had been told by family members that his parents and Mr. Truitt had agreed that the Driveway would be a common driveway or a joint driveway. Although this testimony does not stand as proof of any such agreement, it does provide the basis for Mr. Cassady's claim of entitlement to use the Driveway.

Mr. Cassady abandoned his plans to expand the Crowded Hut and, in 1985, sold Lot 8 with the Crowded Hut to Lightfoot Cook ("Ms. Cook"). The deed to Ms. Cook included a survey which showed that the Driveway leading from Pondview Drive substantially encroached on Lot 9. At this time, even though Lot 8 had a frontage of more than 75 feet on Pondview Drive, the only actual physical access to the Crowded Hut was along the Driveway which straddled the boundary between Lots 8 and [*8] 9. Ms. Cook rented the property to tenants who made use of the Driveway in a manner similar to that of Mr. Cassady. n7 The use of the Driveway by Ms. Cook's tenants in a fashion similar to that of Mr. Cassady was also regular and continuous. Ms. Cook's tenants used the Driveway believing that the right to use the Driveway was associated with her ownership of, and their leasing of, the Crowded Hut. n8

> n7 The Hughletts point out that not all tenants testified to the manner of use by Ms. Cook's tenants. I am satisfied that I am entitled to draw the inference from the testimony of the tenant who appeared at trial that this was the common use made by the tenants. Although Ms. Cook never resided in the Crowded Hut, the evidence leads to the conclusion that the property was regularly occupied by tenants.
>
> n8 During the time of Ms. Cook's ownership, the only persons using the Driveway on a regular basis were Mr. Truitt and his family and authorized visitors and her tenants and their families and authorized visitors. Thus, use of the Driveway was not available to the public.

[*9]

In 1988, Ms. Cook sold Lot 8 to the Browns. n9 They continued to use the Driveway on a regular basis in the same manner as Mr. Cassady and Ms. Cook's tenants until 2000, when Houston Ventures, as the builder of the house on Lot 9, erected a fence through the Driveway and blocked the Browns' access to the garage and to their kitchen door. The Browns used the Driveway for access to their garage, which Mrs. Brown also used for refinishing furniture for her antique business. The use was obvious to Mr. Truitt, and it was under a claim of right. Similarly, use of the Driveway was limited to the Truitts and the Browns and their families, guests, and those doing business with them.

> n9 The Browns did not obtain a survey when they bought the Crowded Hut. They were, however, aware of the survey prepared for Ms. Cook.

The Browns expanded the Crowded Hut in the early 1990s. This included the development of a new entrance and another driveway from Pondview Drive that provided access to the expanded portion of their home and [*10] to a boat launching ramp which they installed on the pond. n10

n10 Mr. Truitt never expressed any objections to their use of the Driveway. Sometime during the early 1990s, however, Mrs. Brown approached Mr. Truitt to see if a permanent easement agreement could be negotiated to confirm their continuing right to use the Driveway between Lots 8 and 9. Whether Mr. Truitt rejected that request or just never "got around" to dealing with it is not clear. It is clear, however, that no written easement was ever granted.

In 1998, both Mr. and Mrs. Truitt passed away. n11 Their children decided to sell Lot 9 and the house on Lot 10 separately. In order to remedy the encroachment of the house onto a portion of Lot 9, it was necessary to reconfigure the westerly boundary of Lot 9. n12 With the area of Lot 9 reduced through the revisions necessary to cure the encroachment, it was sold to Houston Ventures. Houston Ventures built a house on Lot 9 and installed a new driveway on Lot 9 and running along the boundary line between [*11] Lot 8 and Lot 9. Houston Ventures also erected a fence along the boundary line between Lot 8 and Lot 9; that fence deprived the Browns of their use of the Driveway and, thus, of their access to the garage.

n11 I note that throughout this Memorandum Opinion, I refer primarily to Mr. Truitt. I do that for two reasons: convenience and the paucity of evidence reflecting Mrs. Truitt's conduct. For present purposes, Mr. Truitt's conduct and knowledge are attributed to Mrs. Truitt.

n12 Following the deaths of Mr. and Mrs. Truitt, Mrs. Brown approached the executrix of their estates about securing a written easement agreement. The Browns' request for an easement agreement was rejected.

Houston Ventures sold Lot 9 to the Hughletts on March 3, 2000. When they acquired Lot 9, the Hughletts were aware of the Browns' claim to easement over the easterly portion of Lot 9. Since then, the Browns have made no use of the Driveway that existed between Lots 8 and 9.

## II. Contentions of the Parties

The Browns seek a determination [*12] that they hold an easement over that portion of Lot 9 that has been used for the Driveway that provided them access to their garage and also to the area beside their kitchen door for the parking of cars. They claim an easement both by prescription and by the doctrine of necessity or implication.

The Hughletts, while conceding that the Driveway existed for more than 20 years, assert that the use was not continuous and that it was not adverse or hostile during the years when Mr. Cassady owned Lot 8. At the heart of their challenge to the easement by prescription is the contention that the relationship between an uncle and a nephew cannot be adverse (or is presumptively permissive). Alternatively, they suggest that a different, more onerous, standard must be applied to reflect the unique familial relationship. They also note that easements by prescription, unlike adverse possession claims, must be established by clear and convincing evidence, and are not favored by the law. As to the Browns' claim of easement by necessity, the Hughletts point out that there is no necessity since Lot 8 has a full frontage on Pondview Drive and, even if access to the garage could be viewed as a necessity, [*13] when any such "necessity" was created (*i.e.* at the time the garage was erected), common ownership of Lots 8 and 9 no longer existed.

## III. Analysis

[HN1] "An easement may be created in any of several ways: by express grant or reservation, by implication, by necessity, or by prescription." n13 The Browns have not sought to prove an express grant or reservation of an easement. Also, because Lot 8 has full access to Pondview Drive, a public road, the Browns cannot prevail under a claim of easement by necessity, a form of easement by implication designed to avoid land-locking one parcel as the result of the conveyance of another parcel by the same landowner. Thus, the Browns must seek to establish any right to use the Driveway by claim to an easement by implication or an easement by prescription.

n13 *Judge v. Rago*, 570 A.2d 253, 255 (Del. 1990).

### A. Easement by Implication

The Browns assert that they have acquired an easement by implication that assures them the right to use the Driveway. [*14]

[HN2] An easement by implication arises under a limited set of circumstances. If a single party owns two parcels of property and uses one to benefit the other, no actual easement is created since only one owner is involved. Because this use resembles an easement, however, it is referred to as a "quasi-easement." If the property owner then conveys the "quasi-

servient tenement," he may retain an actual easement appurtenant to the land he keeps, even if the conveyance is wholly silent on the question of easements and even if the easement is not absolutely necessary for the enjoyment of the retained property. Thus, if a property owner has traditionally crossed parcel A to reach parcel B and he sells parcel A, he may continue to cross that parcel. It is presumed that a grantor in this situation does not wish to abandon the preexisting land use; the grantee is put on notice by observing evidence of the preexisting use. The key to an implied easement is the existence of a quasi-easement. n14

[HN3] A party seeking an easement by implication must demonstrate:

> (1) unity of title during which time a servitude is imposed on one part of an estate in favor of another part, the servitude [*15] being in use at the time of severance of title; (2) the nature of the servitude must appear to be permanent and obvious prior to the severance; and (3) the servitude was necessary for the reasonable enjoyment of the other part of the property at the time of severance. n15

To the extent that the Browns seek an easement by implication to Pondview Drive, their claim fails for the simple reason that they did not prove that at the time of the subdivision of the lots in Red Mill Manor and their conveyance to the various Truitt heirs, there was a driveway running from Pondview Drive to the Crowded Hut.

n14 *Id.* at 258 (citations omitted).

n15, *aff'd,* 622 A.2d 1097 [Table]; *see also* 7 THOMPSON ON REAL PROPERTY, § 60.03(b)(4)(i), at 426 (1994).

Before the common ownership was severed, however, Mr. Shaffer and then Mrs. Cassady and her family used the short driveway from the dirt lane to the west [*16] side of the Crowded Hut where cars were parked. Even though that short driveway may have been obvious and was in existence at the time the parcels were subdivided, the use of that driveway was, although somewhat convenient, not necessary for the reasonable enjoyment of the Crowded Hut. Parking next to the kitchen door may have facilitated entrance to the Crowded Hut, but it cannot be considered to have been "necessary" because of the very limited burden associated with walking the short distance around the corner of this small dwelling. Thus, as a matter of fact, the Browns have failed to demonstrate that at the time of severance of what is now Lot 8 from what is now Lot 9, there was any "necessity" associated with the use of that short driveway. Accordingly, their claim to an easement by implication fails.

B. Easement by Prescription

The framework for analyzing a claim of easement by prescription is not in dispute.

> [HN4] In order to establish an easement by prescription, the plaintiffs must demonstrate, by clear and convincing evidence, that they or persons in privity with them have used the disputed area (1) openly and notoriously; (2) exclusively; (3) continuously; and (4) [*17] adverse to the rights of others for an uninterrupted 20-year period. n16

Thus, the Browns bear the burden of demonstrating their entitlement to an easement by prescription through "clear and convincing evidence." n17 Furthermore, the Court must evaluate the evidence in light of the principle that easements by prescription are generally disfavored because they "necessarily work forfeitures of existing property rights." n18 The 20-year period over which the Browns must demonstrate continuous, n19 open and notorious, exclusive, n20 and hostile n21 use includes ownership of Lot 8 by the Browns, Ms. Cook and Mr. Cassady. I start with the Brown's tenure and work backward in time.

n16 *Rowe v. Everett,* Del. Ch., 2001 Del. Ch. LEXIS 109, 2001 WL 1019366, at *1 (Del. Ch. Aug. 22, 2001) (quoting *Rowe v. Everett,* Del. Ch., C.A. No. 1967-S, Glasscock, M. (July 21, 2001)); *Anolick v. Holy Trinity Greek Orthodox Church, Inc.,* 787 A.2d 732, 740 (Del. Ch. 2001).

n17 *Lickle v. Frank W. Diver, Inc.,* 43 Del. Ch. 478, 238 A.2d 326, 329 (Del. 1968).

n18 *Berger v. Colonial Parking, Inc.,* 1993 Del. Ch. LEXIS 95, 1993 WL 208761, at *3 (Del. Ch. June 9, 1993).

[*18]

n19 [HN5] "Continuous use does not mean constant use but simply the exercise of the claimed right more or less frequently according to the nature of the use." *Id.*

n20 [HN6] For purposes of an easement by prescription, the use must be exclusive "as against the public at large," but the true owner and the person acquiring the easement by prescription may both make use of the easement. *See Anolick, 787 A.2d at 741, n.15; Marta v. Trincia, 26 Del. Ch. 94, 22 A.2d 519, 520 (Del. Ch. 1941).*

n21 [HN7] "The terms 'adverse use' and 'hostile use' are used interchangeably. A use is adverse or hostile if it is inconsistent with the rights of the owner. The use must not be subordinate or subservient to the owner's rights." *Berger, 1993 Del. Ch. LEXIS 95, 1993 WL 208761,* at *4 (citation omitted).

1. The Brown Years (from 1988)

As to the period from 1988 through early 2000, when the fence was erected, I am satisfied that the Browns have met the burden of proving, by clear and convincing evidence, each element necessary to support a prescriptive claim. Their use of the Driveway was open and notorious, [*19] and they informed Mr. Truitt and others of their use of the Driveway. n22 During this period, the only persons using the Driveway were the Browns, the Truitts and those persons authorized by one of them. Thus, their use was exclusive. In addition, their use was continuous. The Browns' use of the Driveway was adverse and hostile, as those terms are utilized in this area of the law, to Mr. Truitt. The Browns used the Driveway as if they had a legal right to use the Driveway and, thus, they satisfy their burden of demonstrating that their use was adverse to Mr. Truitt and to his heirs in the period following Mr. Truitt's death.

n22 The regular use of a driveway has been characterized as open and notorious. *See Rowe, 2001 Del. Ch. LEXIS 109, 2001 WL 1019366,* at *2.

At some point in the early 1990s, Mrs. Brown approached Mr. Truitt in an effort to obtain written documentation of the easement. After Mr. Truitt's death, Mrs. Brown also approached the executrix of his estate, a daughter of Mr. Truitt. It could be argued that [*20] Mrs. Brown's efforts to obtain written documentation constitute something of an acknowledgment that the use had been permissive as opposed to adverse. I do not view the effort to negotiate a resolution as a waiver of any claim to rights arising by prescription. n23 It is prudent to resolve through negotiation and documentation that which might otherwise give rise to, as it did here, litigation.

n23 *See Berger, 1993 Del. Ch. LEXIS 95, 1993 WL 208761,* at *4 (explaining *Brosius-Eliason Co. v. DiMondi, 1991 Del. Ch. LEXIS 193, 1991 WL 242640* (Del. Ch. Nov. 15, 1991)).

2. The Cook Years (1985-1988)

The Browns have also demonstrated by clear and convincing evidence all of the elements necessary to support a claim for a prescriptive easement during the period from 1985 through 1988, when Ms. Cook owned the Crowded Hut. Similar use was made of the Driveway by her tenants and that satisfies the requirement that the use be open and notorious. The use also was continuous in that it was regular and persistent. n24 As with the use by the [*21] Browns, I am satisfied that Ms. Cook and her tenants perceived that they were using the Driveway as a matter of right and that Mr. Truitt either understood or should have understood their use in that light. Also, the Driveway was used only by the Truitts, the tenants, and their invitees, thus satisfying the "exclusivity" prong.

n24 Any hiatus between Ms. Cook's tenants did not, in my opinion, break the running of the 20-year period. With rented residential property, it is both typical and foreseeable that there will be periods between tenants when no use is made of the property.

The Hughletts argue that Ms. Cook's failure to live in the Crowded Hut breaks the chain of privity which allows the "tacking" of periods of adverse possession. [HN8] Because the evidence demonstrates that all of the rights of the tenants derived from the landlord's rights, tacking during the period of tenant possession and use is allowed. n25

n25 *See Berger, 1993 Del. Ch. LEXIS 95, 1993 WL 208761,* at *5. ("Where, however, it appears that both [tenant and landlord] understood that the right to occupy certain premises passed under the lease, the tenant's occupancy will be treated as that of the landlord even though the premises were not covered in the legal descrip-

tion of the lease." (quoting 4 Herbert T. Tiffany, *The Law of Real Property* § 1146, at 778 (3d ed. 1975)).

[*22]

3. The Cassady Years (1974-1985)

During Mr. Cassady's ownership of Lot 8, his use was open and notorious, continuous, and exclusive for the same reasons as the use by Ms. Cook and her tenants and the Browns. The question whether Mr. Cassady's use of the Driveway was adverse or hostile to the rights of Mr. Truitt is a more difficult question. This difficulty arises because Mr. Cassady and Mr. Truitt were nephew and uncle, respectively, and were very fond of each other. Because of this warm and caring familial relationship, the question necessarily becomes one of whether Mr. Cassady's use was permissive. Unless the Browns can demonstrate that Mr. Cassady's use was indeed hostile or adverse to Mr. Truitt's rights, the Cassady years may not be counted against the required 20-year period, and their claim for an easement by prescription would fail.

Some jurisdictions apply a presumption of permissive use when "close" family members are involved in adverse or prescriptive claims. n26 Others require "strong proof" of hostility. n27 Yet others take the position that "when family members own adjoining parcels of real property and one is using a part of the other's property for her own benefit, [*23] such use gives rise to an inference, if not a presumption, that the use is permissive due to the familial relationship." n28 Finally, another view is that "while evidence of a familial relationship may sometimes assist the fact finder in determining the individual nature of the relationship between the claimants or to whose benefit the land was used, standing alone a familial relationship neither puts an end to the inquiry regarding permissive use nor shifts the burden of proof." n29

   n26 *Petsch v. Widger*, 214 Neb. 390, 335 N.W.2d 254, 261 (Neb. 1983) (permission presumed as between not only parent and child or among siblings but also as to "more distant relationships" such as those between step-grandparent--step-grandchild and cousins).

   n27 *In re Estate of Qualteri*, 757 P.2d 1093, 1095 (Colo. App. 1988) ("'strong proof of hostility is required if claimant takes possession of property belonging to a relative.") (quoting/citing *Kelly v. Mullin*, 159 Colo. 573, 413 P.2d 186 (Colo. 1966)); *McIntosh v. Chincoteague Vol. Fire Co., Inc.*, 220 Va. 553, 260 S.E.2d 457, 460 (Va. 1979); *Cope v. Cope*, 158 Mont. 388, 493 P.2d 336, 338 (Mont. 1971) ("It is a general principle of law that members of a family may not acquire an easement by prescription against each other in the absence of a showing of a clear, positive, and continued disclaimer and disavowal of title.").

[*24]

   n28 *Boldt v. Roth*, 618 N.W.2d 393, 398 (Minn. 2000).

   n29 *Totman v. Malloy*, 431 Mass. 143, 725 N.E.2d 1045, 1049 (Mass. 2000).

[HN9] Determination of whether there is "hostility" for purposes of an adverse or prescriptive claim is a fact-intensive inquiry. The effort must focus upon objective facts because of difficulties inherent in any inquiry into a person's subjective intent, especially in light of the many years over which the inquiry may be required. That a person may be more likely to allow permissive use of her property by a family member than by a stranger is, in general, an accurate assessment of how we interact with others. n30 On the other hand, it is not so compelling, particularly in which, as here, the relationship is that between an uncle and a nephew, to create a firm presumption or to establish an even higher evidentiary burden. Nevertheless, the familial relationship may be an important factor when evaluated in the context of all the other relevant factors guiding the Court in its resolution of the prescriptive claim. Of course, the closer the familial relationship, [*25] the more compelling that relationship usually will be. n31

   n30 While inquiry into the nature of the personal relationship may require consideration of factors that one would prefer to avoid, *see Totman*, 725 N.E.2d at 1048, it may, at least in some cases, be unavoidable. See, e.g., *Wypchoski v. Berg*, 1998 Conn. Super. LEXIS 460, 1998 W.L. 88313, at *5 (Conn. Super. Ct., Feb. 19, 1998) ("And it is also true that where the owner is on *friendly* terms with the user of the easement and allows them to use the right of way as a matter of neighborly accommodation a prescriptive easement cannot be found." (emphasis added)); *Pittsburgh & Lake Erie R.R. Co. v. Stowe Township*, 374 Pa. 54, 96 A.2d 892, 894 (Pa. 1953).

   n31 Indeed, in the context of a parent-child relationship, that factor may become highly significant.

With these principles in mind, I find that the Browns have proved by clear and convincing evidence that Mr. Cassady's use of the Driveway following construction of the garage in 1975 was adverse [*26] and hostile to the interests of Mr. Truitt. n32 First, Mr. Cassady credibly explained the basis for his belief that he had a right to use the Driveway, i.e., that his parents and Mr. Truitt had agreed to a joint driveway. Second, he acted in a manner consistent with that understanding by building the garage. Reasonable access to that garage was dependent upon the use of Lot 9. If access were limited to Lot 8 only, it would not have been feasible to park a car in the garage. I do not believe that the expense of building a garage would have been incurred without a claim of right to use the Driveway. Moreover, as the owner of Lot 9 and, perhaps more importantly, as one who helped in the construction of the garage, Mr. Truitt could not have observed the construction of the garage without an appreciation that the crossing of his lands by those residing in the Crowded Hut was critical to its normal and intended use. In addition, there is no reason to conclude that Mr. Cassady, even though he regularly used the Driveway for more than a decade, ever sought or obtained Mr. Truitt's permission. I acknowledge that Mr. Truitt and Mr. Cassady were close relatives with a good personal relationship. [*27] In this context, I give this consideration significant weight, but I remain convinced that this factor does not preclude the conclusion which I draw, even against the standard of clear and convincing evidence which the Browns must satisfy. Thus, at least from the time of construction of the garage in 1975, Mr. Cassady's use of the Driveway was "hostile" to the rights of Mr. Truitt. n33

---

n32 As to the short period of Mr. Cassady's ownership of the Crowded Hut before construction of the garage, I have reservations as to whether the Browns demonstrated that Mr. Cassady's use was "hostile." This is not because the evidence suggests that the use was permissive; instead, it is the result of the Browns' heavy burden - demonstrating each element of a prescriptive claim by clear and convincing evidence - that causes me to refrain from concluding that the use was "hostile" during this period.

n33 It should be emphasized that this is not an easement based upon principles of estoppel. Instead, these facts compel the conclusion that Mr. Cassady's right to use the Driveway, particularly in the context of access to the garage, was a factor in his decision to incur the expense of building the garage and, thus, was done under a claim of right.

[*28]

It should also be noted that Mr. Truitt in the early 1980s prepared for Mr. Cassady a set of plans for expansion of the Crowded Hut. On these plans, he showed a driveway running from a new garage to be added to the Crowded Hut that tied into the existing Driveway on both Lots 8 and 9. By this time, the Driveway leading from the Crowded Hut along the common boundary line to Pondview Drive had been in existence for approximately a decade. Although the plans do not compel the conclusion that the Driveway was to be used by Mr. Cassady as a matter of right, the plans are helpful in recognizing what the parties reasonably understood to be the status at that time. Thus, the plans stand as evidence that Mr. Cassady's understanding of his rights to use the Driveway was not inconsistent with Mr. Truitt's understanding.

4. Tacking and its consequences

Thus, the Browns have established, by clear and convincing evidence, that the three owners, Mr. Cassady, Ms. Cook (through her tenants) and the Browns, used the Driveway in an open and notorious, continuous, exclusive and hostile fashion for a combined period in excess of 20 years. n34 As successor fee owners of Lot 8, there is privity between [*29] them. n35 As such, the Browns have established their right to an easement by prescription.

---

n34 I also credit the testimony of two long-time residents of Pondview Drive who described the use of the Driveway from Pondview Drive over Lots 8 and 9 to the Crowded Hut in terms consistent with the Court's findings.

n35 Marta, 22 A.2d at 521.

---

5. Equitable considerations

Because of their right to use the Driveway by prescription, the Browns are entitled to an injunction requiring the Hughletts to remove the fence and prohibiting the Hughletts from interfering with their use of the Driveway in a manner consistent with that which had been its use for a period of almost a quarter of a century before construction of the fence by Houston Ventures. The harm to the Hughletts from enforcing the injunction will be minimal, particularly in light of the fact that they acquired their house with knowledge of the pending title dispute. n36 The harm to the Browns from having been

denied the historical access to [*30] their garage, on balance, supports the entry of the injunction.

> n36 Indeed, their owners' title insurance policy, secured when they purchased Lot 9, contains an exception for the disputed boundary line.

The area of the easement is shown generally on the survey prepared for the conveyance by Mr. Cassady to Ms. Cook. Of course, the Driveway depicted on that plot is not to scale. If additional evidence must be taken to delineate precisely the easement area, another hearing will be scheduled.

### IV. CONCLUSION

For the foregoing reasons, I find that the Browns are entitled to an easement by prescription over the easterly portion of the Hughletts' lot.

I ask that counsel confer and submit a form of order to implement this memorandum opinion.

John W. Noble

Vice Chancellor